This video was recorded on September 20, 2021 at 4 p.m.  The next two cases are the Novartis v. Par cases and the reverse. We're taking them together. 2015, 1061, 1141. And we're giving you 20 minutes each side. Mr. Brown, you have broken up your argument into 17-3. I guess on the assumption that you've got a rather minor cross-appeal, we just assume you take your 20. And we understand the context. Understood, Your Honor. So, Mr. Lowe, please proceed. May it please the Court. Novartis proved by a preponderance of the evidence that the acetaldehyde in the accused products is an agent that reduces oxidative degradation and, therefore, is an antioxidant. Novartis proved how acetaldehyde can work as an antioxidant. It said in scientific literature, setting forth the undisputed fact… Wasn't acetaldehyde an impurity here? Par characterizes it as an impurity in its product. Does the amount that was in it meet the percentages in the claims for an antioxidant? The par and its specification expressly sets forth an amount that falls within the claimed amount. For acetaldehyde? Yes, for acetaldehyde, Your Honor. Can I ask you a question? Is the determination of whether here acetaldehyde is an antioxidant dependent on whether it performs the role of oxidative degradation in a particular mixture? Or is it enough if it ever does that?  An antioxidant here is an agent that reduces oxidative degradation without regard to the particular pharmaceutical formulation in which it does so. And that was an explicit finding in the district court's opinion in 2019. I guess I thought my question was more about claim construction. The claim construction doesn't require that it perform the act of reducing oxidative degradation in a particular… So even if it didn't do so when functioning in this patch… That's correct. It would nevertheless meet the claim requirement? That's correct. So Novartis proved how acetaldehyde can work as an antioxidant. It said in scientific literature, setting forth the undisputed fact that acetaldehyde is a reducing agent, which can readily undergo oxidation, thereby consuming oxidizing agents and preventing them from attacking other molecules. Well, the court found, as a matter of fact, that it is a reducing agent, but also, as a matter of fact, that it hadn't been previously considered to be an antioxidant. Well, that again, Your Honor, is irrelevant. Again, an antioxidant here is an agent that reduces oxidative degradation. And whether it was recognized to have done so previously or was proven in experimental testing here, as Dr. Davies did… Well, another finding, fact number 10, has not proven acetaldehyde is an antioxidant. And we submit that that was a clear error of the district court. So Novartis, in fact… Because of a combination of testimony that it could do this, and second, experimental evidence that you think showed that it did do it. Well, not just testimony, Your Honor. The objective facts prove that. There's scientific literature establishing how acetaldehyde can work as an antioxidant. And there's also experimental proof showing that it does, in fact, reduce oxidative degradation to a statistically significant degree. And was the evidence for this Davies material? Yes, this is Dr. Davies' control. That was discredited, wasn't it? It had a lot of flaws in it. It wasn't accepted. It was discounted by the district court based on the district court's misunderstanding of the five objective facts. And again, these determinations and these misunderstandings do not turn on an evaluation of Dr. Davies' credibility, but upon a misunderstanding of the objective facts surrounding that testing. So, let me talk about that testing in further detail. This was a controlled head-to-head stress test conducted by Novartis' expert, Dr. Davies. That test showed that acetaldehyde reduced the oxidative degradation of ribostigmine by 30% under oxidizing conditions. Dr. Davies then took those results, and he performed three independent statistical analyses on that. Each of those independent statistical analyses showed that the reduction of oxidative degradation in the test was statistically significant with a confidence of over 90%. The court made a finding that it did not yield statistically significant results. That was a clear error. Dr. Davies presented the district court with three independent statistical analyses. The first, a one-tailed t-test, showed a statistically significant reduction of oxidative degradation with a confidence of over 95%. The second, a two-tailed t-test, the one that the district court says was appropriate to consider here, showed a statistically significant reduction with a confidence of greater than 90%. And the third, a linear regression analysis, showed a statistically significant difference with a confidence of greater than 99%. So when you look at those three analyses, you are left with a definite and firm conviction that the district court made an error in selecting the 87% figure that it ultimately relied on. Now there's another aspect of the statistical analysis that the district court got wrong. That's the difference between equal variance and unequal variance. Dr. Davies explained at trial that equal variance was the appropriate statistical technique to use with regard to all of the three analyses he used here. And it went undisputed that those three independent statistical analyses he undertook were properly calculated using equal variance. And the 87% figure that he ultimately relied on was improperly calculated using unequal variance. So even if we take the district court at its word that the only appropriate statistical analysis to consider here was a two-tailed t-test, there were two two-tailed t-tests for the district court to have considered. One, the properly calculated one using equal variance, which showed a statistically significant difference with a confidence of greater than 90%, and the improperly calculated one, which showed 87% confidence. And the judge picked the wrong one. Now that was one of the more egregious errors that the district court made in this instance. But let me just step back and talk about the basic science of oxidation. The district court made a fundamental mistake in misapprehending the chemical mechanism by which acid albehye, a known reducing agent, can work as an antioxidant. It erroneously found that reducing agents form a radical after being oxidized that is more stable than the radicals that cause oxidative degradation. And the district court then proceeded to rely on that error to assert that, quote, the likelihood that acid aldehyde is an antioxidant is decreased because it does not form a stable radical, unquote. That's incorrect. Now there are some antioxidants which work that way. They're called free radical scavengers. But that's not how all antioxidants work. Novartis explained, and PARS experts agreed, that there is another class of antioxidants called reducing agent antioxidants or oxygen scavengers. These do not work by forming a stable radical. Instead, they work by undergoing oxidation in place of other molecules. Is that sacrificial oxidation? This is what is referred to as sacrificial oxidation. And that's how reducing agent antioxidants work. That's how acid aldehyde works. And that's how several well-known antioxidants work, including, for example, ascorbic acid or vitamin C. Now the chemical mechanism that distinguishes free radical scavengers from reducing agent antioxidants is well recognized in the art, including the art of record. Modern pharmaceutics recognizes it. The EMEA guidelines concerning the use of antioxidants and drugs recognizes it. And so too do PARS experts. But the district court did not. Instead, it confused the mechanism by which free radical scavengers work with the mechanism by which reducing agent antioxidants work. It erroneously found that because acid aldehyde, a reducing agent, does not form a stable radical like a free radical scavenger, it was unlikely to be an antioxidant. So that was the first of the district court's three clear errors. The second clear error that the district court made was in crediting PARS' speculation that acid aldehyde promotes oxidation by forming unstable radicals. There was no reliable evidence in the record to support that speculation. PARSite's one reference. Can I ask you, if it were the case that acid aldehyde did form free radicals, which would then have essentially a counterbalancing effect from its sacrificial role, sacrificial oxidation role, what would become your argument? Well, again, whether or not acid aldehyde forms a stable or unstable radical is irrelevant to its antioxidant capability under the sacrificial oxidation mechanism. If a compound is capable of undergoing oxidation, it is satisfying the minimum requirement for an antioxidant, as even Dr. Ganim on PARSite acknowledged. Any compound that undergoes oxidation, so it's losing an electron, automatically becomes a antioxidant for the other molecules that it's mixed up with? No, but in this instance, certainly acid aldehyde fulfills that requirement. As you saw from the testing performed by Dr. Davies, done under conditions that model the effects in a pharmaceutical composition, acid aldehyde, in fact, reduced and did not promote the oxidative degradation. What I guess I'm trying to understand is this, whether there are theoretically potential countervailing mechanisms at work. Theoretically, the net effect is what would determine whether the oxidative degradation is being dampened. And to figure out whether in a particular case the oxidative degradation of the molecule of interest is being dampened or not, that is the net effect, you would need to do a reliable experiment. And if that's the situation, then everything here turns on how reliable Dr. Davies' experiment was, and the district court found not so much. But again, the scientific literature here, at least the reliable scientific literature, shows that acid aldehyde reduces oxidative degradation. There is no reliable evidence to show that it promotes oxidation or forms unstable radicals that could do so in the case of ribostigmine or any other drug. So the expert testimony you're saying just did not have a sound scientific foundation. That's correct, Your Honor. So let me just talk about that reference in brief. The second error that the district court made was in crediting Parr's speculation that acid aldehyde could somehow promote oxidative degradation by forming unstable radicals. And then Parr cited McNesby in connection with that speculation. But McNesby only states that acid aldehyde forms peracetic acid at minus 30 degrees centigrade. Peracetic acid is not a radical, and McNesby expressly states that peracetic acid degrades at temperatures above minus 30 degrees centigrade to acetic acid, and acetic acid is not a radical either. And to the extent that McNesby shows radicals forming from an aldehyde, those radicals are the result of a purely hypothetical mechanism. So in sum, there is no reliable evidence of record to show that acid aldehyde could promote oxidative degradation, and it was clear error for the district court to have found otherwise. Turning to the third clear error that the district court made, and that was discounting Dr. Davies' stress test, which proves that acid aldehyde is an agent that reduces oxidative degradation to a statistically significant degree. And as I mentioned, this error did not turn upon an assessment of Dr. Davies' credibility, but upon the district court's misapprehension of five objective facts. First, the district court incorrectly found that Dr. Davies did not cite any literature to support the use of his test to determine whether acid aldehyde could reduce oxidative degradation. That's wrong. Dr. Davies cited no fewer than five references establishing that tests like his, done under conditions like his, are widely used in the pharmaceutical industry to measure quantitatively the oxidative degradation of drugs and drug products. What about the criticism of Dr. Davies' test that he did not, in fact, run the stress test on a known antioxidant to see if it produced the results that it should if it was properly separating antioxidants from non-antioxidants? Well, that criticism is yet another clear error. The district court wrongly criticized Dr. Davies for not running his test with an antioxidant other than acid aldehyde, but there is no serious dispute that Dr. Davies' stress test measured what it intended to measure, which was the oxidative degradation. I'm not sure that's an answer to my question. I don't think that there's any dispute that the particulars of his stress test were original, and what you said a couple of moments ago is that it's like other stress tests, but the particulars weren't. So the district court said, or at least the LARDIS said, if you're going to figure out whether his particular stress test is a reliable discriminator between antioxidants and not, run it on some known antioxidants and see if you get the positive results. If you don't do that, I'm not going to trust your experiment. What's wrong with that reasoning? The problem with that reasoning is that running the test with another antioxidant would not have changed the fact that— How do we know until it's run? Acid aldehyde, this is the most simple and transparent experiment one could imagine for answering the question whether acid aldehyde reduces oxidative degradation. You have two sets of test samples. They come from an identical stock solution. They have identical amounts of ribostigmine. They have identical amounts of the oxidizing agent TBHP. The only difference between the two samples is the presence or absence of acid aldehyde. You subject them to identical oxidizing conditions. At 6, 15, and 21 hours, you take measurements of ribostigmine and its two oxidative degradation products, Impurity-4 and ECAV. If acid aldehyde does nothing, you see no difference. Mr. Lowe, you wanted to save some time. You can continue now or save it. I'll continue for one more minute and then I'll stop. At the end of this experiment, you either have acid aldehyde promoting oxidative degradation, as Parr suggests, may have occurred. You have acid aldehyde doing nothing. Or you have, in this instance, a statistically significant reduction in oxidative degradation. The only conclusion that can be drawn from these results, because the only variable in this test, is that acid aldehyde was responsible for that reduction. Running the test with another antioxidant wouldn't have shown anything beyond what those results already show, that acid aldehyde reduces oxidative degradation. And they would not have changed those results, and Parr does not explain why. And I'll reserve the remainder of my time for rebuttal. We will hold it for you. Mr. Lowe, Mr. Brown. Good morning, Your Honors. May it please the Court. We would submit this case presents the classic example of a district court judge weighing credibility, weighing evidence, considering competing in different testimony that was presented at trial, different documentary evidence that was submitted. If an expert doesn't actually have any sound science behind what the expert says, the expert's declaration in court just doesn't count. So it depends on the actual soundness of the explanation. So why is your expert sound? Because Dr. Ghanem, who's a well-respected… I know the qualifications. Rule 702 is about qualifications and what the man says. And Dr. Ghanem testified based on the chemical reviews article and the McNesby reference. He gave very detailed testimony that went on for pages about what the mechanism of action is described there is, how that makes acid aldehyde unlikely to be an antioxidant because when it is oxidized, it creates additional radicals that can contribute to oxidative degradation. He specifically addressed Dr. Davies' criticism about the minus 30 degrees Celsius, which is that was a mechanistic study in which the researchers were trying to prove their mechanism they proposed by isolating a chemical compound. The fact that you can isolate a stable chemical compound is very different from that compound appearing as part of a chemical mechanism or reaction and being a reactive compound. The fact that it's not stable is the problem. It can cause further damage. And so Dr. Davies gave – or excuse me, Dr. Ghanem gave very sound testimony based on the McNesby reference. The district court found it credible, found it persuasive, and found that Dr. Davies' testimony about the minus 30 degrees C didn't really address Dr. Ghanem's testimony. And so in that regard, with respect to the mechanism of action, I think Dr. Ghanem's testimony is very well supported. His testimony in criticism of Dr. Davies' test is also very well supported. The test, as the district court found, had many fundamental errors, and I think it's the combination of those errors and the combination of the fact findings is particularly telling because what Novartis did here is they took an impurity in the product. It's not recognized to be an antioxidant. Okay, well, fair enough. Can you show that it is one? The fact that this is an impurity is, at least at this stage of the case, completely immaterial, correct? It is immaterial to the fact finding. We have to take as a given that there was acetaldehyde in there. And the district court didn't say in amounts too small. The district court said one and only one thing, this is not an antioxidant. Correct. The district court did not rule on the amount question at all. It only ruled on the issue of is it an antioxidant or is it not an antioxidant. And so the combination of fact findings with regard to acetaldehyde, the court first finds it's not known to be an antioxidant. And by the way, the first question I asked, Mr. Lowe, do you agree with the answer that whether something is an antioxidant, if it is under the definition, the claim construction, that it dampens the oxidative degradation, that as long as it does so ever, it doesn't matter whether it's doing so in the particular patch here? The court was very explicit that it doesn't have to be doing so in the particular patch. I think the court's claim construction was just a tad more general than that. The court construed antioxidant as agent that reduces oxidative degradation. Of whatever. I mean, it doesn't even have to reduce the oxidative degradation of the rivastigmine, right? That's correct. Of anything else, will do. That's correct. And so after making the finding that it's not known to be one, has never been described one in the pharmaceutical literature up to this point. So then the question, okay, Novartis, can you prove that it is one? The next step is, well, what test do you do? And do they do the test that's specifically laid out in the patent, which is the column four lines 20 to 30? No. Do you do a test that's ever been reported in the literature to determine if a compound is or isn't an antioxidant? No, we don't do those tests. We're going to do a different test that's never been used, a category of test that's never been used to determine if something is or isn't an antioxidant. Okay, fair enough. Are you going to do the basic background to show that your test separates things that are antioxidants from things that are not antioxidants? Well, no, he doesn't do that either. He doesn't test things that are antioxidants to see what they do in the test. He doesn't test things that are not antioxidants. For all we know, anything you put in that test tube will show the results that he received from this test. The district court particularly found compelling the fact that 20 percent of the reaction products were unknown, where you're relying on very tiny differences where Dr. Davies is trying to find statistical significance. And you combine that with the fact that the test has never been used before for this purpose, Dr. Davies doesn't even know what's going on in his test tubes. He doesn't know what reactions are happening. And so all in all, the district court found because of those, the combination, and the court particularly called out the combination of the unknown reaction products with the fact that the test hadn't been used for this purpose before, as something that decreased his confidence in giving credibility to the test. Can I take you back away from the experiment for a minute to what's going on conceptually? You don't dispute, I gather, the finding that acetaldehyde is a reducing agent? Not at all. Okay, so can you now explain what the mechanism is by which something that is a reducing agent might not dampen oxidative degradation? And I'm using the word dampen because using the word reduce in an example about oxidation is only confusing. Understood. So when, as I understand it from the trial testimony, when a reducing agent, all that means chemically is it's capable of being oxidized. So that's step one, and then a lot of things could possibly happen. And one of the things... It's capable of being oxidized doesn't mean that it's actually giving electrons to something else, to the agent, the thing that the agent is acting on? Correct. Correct. And it's capable of being oxidized, and at that point, then the question is, does it stop the cyclical oxidation reaction that's going on in the product? And so if it makes something, and Novartis only ever addressed that first step, yes, it can be oxidized. But what happens then? And what happens within the test tube and the formulation at that point? If it continues to contribute to the cyclical oxidation product and doesn't shut it down, then it's not going to be likely to be an antioxidant. If it does shut it down, then it's a potential antioxidant, or it could be found to be so. And here, the point of the McNesby reference is the sort of ultimate outcome of acetaldehyde being oxidized is acetic acid. And the point of the McNesby reference was, how does it get there? How do we get from A to B? What's the mechanism that happens? And that mechanism, as McNesby laid out, was it goes through four different other radicals to get there, among other things. And it's not the kind of chemical reaction that you would expect would shut down the cyclical oxidation reaction. And this is reinforced by the fact that the pharmaceutical literature has never considered it to be one. And so we would submit, for all those reasons, that the district court was absolutely correct in crediting Dr. Gannon's testimony. The defendants had Dr. Klebanoff, who testified at the Watson trial, who was a credentialed chemist. He didn't address Dr. Gannon's testimony. They had a non-chemist provide very limited testimony in response to Dr. Gannon. The court was perfectly justified in crediting that testimony. The court was further justified in considering all of the factors that it considered in not crediting Dr. Davies' test. And then finally, with regard to the statistical significance issue, the court was justified in the court's primary holding, which was that neither party submitted a statistician to explain this to the court and that, therefore, Novartis, with the burden of proof, failed. And then the court's alternative finding that our expert, Dr. Michigny-Atkone's testimony that the one-tailed test was rarely appropriate was also properly credited. She supported that with treatises. And then beyond that, all the other statistical analyses that were in play were after the fact analyses that are improper to do in a scientific context. And so in sum total, Dr. Davies' test was unreliable. The district court provided no usable evidence. And Dr. Gannon's testimony that acid aldehyde may, in fact, promote oxidative degradation was credible. And the court did a classic balancing act. And we would submit, the court addressed a very similar issue in the bio bail, the Andrix case that we cited in our brief. This is scientific evidence that is subject to a fact finding, and there's no clear error here. And with that, unless the court has any other questions. Thank you, Mr. Brown. Mr. Lowe has some rebuttal time, 3.20. Yes, Your Honors. Let me just address the various points that Mr. Brown made. Mr. Brown said that McNesby showed that radicals formed from acid aldehyde. The court can see for itself at page A1404 that that is a hypothetical mechanism. There is no proof that the four radicals that he referred to, in fact, form at minus 30 degrees at room temperature or at 60 degrees or at any other temperature or cause oxidative degradation of any drug. Mr. Brown criticized the test that Dr. Davies ran as not having been done before, simply because the test, specifically under the conditions that Dr. Davies ran and has not been done before, does not mean that the underlying scientific reality of that test is not valid. If a test can quantitatively measure the extent of oxidative degradation of a drug, it can also measure a reduction in the oxidative degradation of that drug. Mr. Brown said that acid aldehyde was never recognized to be an antioxidant. That's incorrect. In fact, the 4-4-0 Chinese patent that we attempted to introduce into evidence expressly calls acid aldehyde an antioxidant. And when the district court questioned Dr. Klebanov and specifically asked him, is acid aldehyde an antioxidant, he said yes, and he explained why. Mr. Brown said that Dr. Davies didn't perform the test that's described in the patent. Doing the test that's described in the patent would require the creation of a transdermal patch, including all the excipients that would go into that patch. That would have confounded the results and would not have been as simple, clear, straightforward, and transparent as the test that Dr. Davies actually did, which, again, shows a statistically significant reduction based on the presence of acid aldehyde in the samples. Mr. Brown said that there was no idea of what was happening in the test and that anything that could have been included in the test may have produced a reduction in oxidative degradation. That's not the case. This test was very carefully controlled, and you can see what happens when something other than acid aldehyde isn't in there. There is oxidative degradation. That's exactly what the control samples were intended to show. Mr. Brown said that Dr. Davies did not account for 20% of the mass of his test samples, and that is incorrect. Dr. Davies ran mass balance calculations showing that over 99% of the mass of his test samples were ribostigmine and its two oxidative degradation byproducts, Impurity-4 and ECAV. Those calculations confirm that the only reaction occurring in the test was the oxidative degradation of ribostigmine. But even if we credit Mr. Brown's speculation that some side reaction could have been occurring, Mr. Brown did not address and PAR has never addressed the fact that if such a side reaction had occurred, it would have affected all of the samples equally and would not have disturbed the observed reduction in oxidative degradation in the test caused by acid aldehyde. Last, Mr. Brown raised the BioVail case. In that case, the patentee actually took a picture of the product, the accused product, using a scanning electron microscope and found that it did not contain the claimed homogenous admixture. In other words, the testing done by the plaintiff did not support his arguments. That is not the case here. We have statistically significant proof that acid aldehyde is an agent that reduces oxidative degradation. We, therefore, have proved by a preponderance of evidence that acid aldehyde is an antioxidant. Thank you. Thank you. Mr. Lowe, the cases will be taken under review.